**Emile POWE, Eileen Hickey, Mark Rosenthal, Ellen Winters, Lynn Felsher, Glenca Smith, Deborah Kaplan, Plaintiffs,**

v.

**Leland MILES, as President of Alfred University, and Alfred University, Defendants.**

**Civ. No. 1968–268.**

United States District Court
W. D. New York.

Sept. 25, 1968.

Neil Fabricant, New York City, David G. Jay, and Jacob D. Hyman, Buffalo, N. Y., (on the brief) for plaintiffs.

C. Everett Shults, Hornell, N. Y., and Nixon, Hargrave, Devans & Doyle, Rochester, N. Y. (John B. McCrory, Rochestre, N. Y., Trial Counsel), for defendants.

CURTIN, District Judge.

The plaintiffs, all students who are presently under a one-semester suspension from Alfred University, commenced this action pursuant to the Civil Rights Act (42 U.S.C. § 1983; 28 U.S.C. § 1343) on August 28, 1968, asking the following relief: (1) an injunction compelling Alfred University to reinstate them as students for this fall semester; (2) an injunction restraining Alfred from imposing penalties upon students for exercising their right to free speech; (3) a declaratory judgment declaring null and void certain guidelines entitled "A Policy on Demonstrations" (see Appendix 1), which was promulgated by the university early in 1968; and (4) damages in the amount of $100,000.

In addition to their main action requesting permanent relief the plaintiffs, by order to show cause, sought a temporary restraining order.

The parties have agreed that the actions for a temporary restraining order and permanent injunction and the declaratory judgment action be tried together, pursuant to Rule 65(a) (2) of the Federal Rules of Civil Procedure.

On Saturday morning, May 11, 1968, an ROTC drill ceremony was held on the football field at Alfred University to honor certain outstanding cadets for their performance during the past school year. This was also the Annual Parents' Day, and the stands at the field were filled with several hundred parents and other spectators. A separate reviewing stand reserved for officials and special guests had been erected about two feet above ground level between the stands and the field, and about eight or ten feet from the football field sideline. Next to the reviewing stand was placed a table upon which various trophies and honors to be awarded certain of the cadets were placed.

As the cadets were forming on the field, the seven plaintiffs, a faculty member and eight other students came out along the sideline in single file between the reviewing stand and the area where the honor cadets were eventually to assemble to receive their awards. These "demonstrators" carried signs which carried four different messages. One called for the abolition of compulsory ROTC at Alfred University; a second advocated the establishment of academic courses in black history; a third urged an increase in the number of Negro scholarships at Alfred; and a fourth protested against the war in Vietnam. The protesters marched up and down two or three times in single file in front of the stands, and then took a standing position in front of the stands with their signs held facing the grandstand. On various occasions, these signs were raised so as to block the spectators' view of the cadets on the field. One of the demonstrators shouted at the people in the grandstand: "You don't want your sons to go to Vietnam and get killed, do you?" Some of the spectators reacted by booing and by shouting back: "Get off the field; get out of the way!"

The Dean of Students, Paul F. Powers, was in the pressbox at the top of the grandstand. He was in a good position to see and hear the reaction of the spectators. He could see that the people in the reviewing stand and many spectators in the grandstand would not be able to see the cadets. Furthermore, he

could observe the position of the demonstration and their probable interference with the cadets marching on the field. After the demonstrators had been on the field for about five minutes, it became clear to the Dean that they intended to remain where they were. He determined that the demonstrators were in violation of the university guidelines, and he then addressed them in these words:

"I now request that you modify your demonstration procedure by leaving the field. You are in violation of the university policy and guidelines in that you are interrupting a classroom situation, and I request that you remove yourselves from the field." (Testimony of Emile Powe at pp. 25–26.)

He repeated this request four times—twice directed to the students involved and twice to the faculty member who was on the field.

About eight of the student demonstrators heeded the Dean's request by walking to the end of the field and by sitting next to the grandstand, with their signs, for the remainder of the drill. The other demonstrators, including the seven plaintiffs and the faculty member, chose to ignore the Dean's order by remaining on the field. In response to their defiance, the Dean made a further announcement:

"In accordance with the university policy on guidelines and the power invested [sic] in me, I now provisionally suspend you from Alfred University. You will have to pick up the charges against you in my office. You are to appear at a hearing on Sunday morning at ten A.M." (Testimony of Emile Powe at p. 26.)

Subsequent to this announcement, Colonel Fred Schumacher, head of the ROTC unit at Alfred, and one of his aides moved the trophy table to a different position on the field so that the presence of the demonstrators would not interfere with the awards ceremony. As they attempted to move the trophy table

through an opening in the line of demonstrators, the students closed their rank and one student elbowed him in the ribs.

The drill lasted about forty-five minutes. From time to time, the demonstrators would hold their signs in such a way so that it was difficult for those in the reviewing stand to see the cadets on the field. Because of the position of the demonstrators on the field, both the band and the brigade had to modify its line of march to avoid the demonstrators. It became impossible for the honored guests to "troop the line" as planned. Because the brigade commander could not clearly see the reviewing stand, he could not present the honor cadets to the reviewing officer in a proper manner. Certain parts of the award ceremony were altered. One person, who was scheduled to present awards to the honor cadets, felt constrained to leave the reviewing stand because of this incident.

During the entire demonstration, no one interfered with the students in any way. For five minutes, they were given ample opportunity to display their signs and march in front of the stands. After the Dean's request, the spectators could have seen their signs even if they had positioned themselves on the other side or at either end of the field.

The plaintiffs were well acquainted with the "Policy on Demonstrations." When these guidelines were first drafted, plaintiff Emile Powe, president of the Students for a Democratic Society on campus, and several other students were asked by President Leland Miles for their comments and suggestions on the guidelines. Having experienced other demonstrations on campus, the "Policy on Demonstrations" was intended to provide reasonable guidelines for the conduct of future demonstrations.

On May 20, 1968 the plaintiffs were given a hearing and they were represented by an attorney, Mr. David G. Jay of Buffalo, New York. This hearing date had been adjourned from May 12,

1968 so that the plaintiffs would have sufficient time to prepare a defense with the aid of legal counsel. After the hearing the students were suspended until January, 1969.

GOVERNMENTAL INVOLVEMENT

Alfred University was incorporated by the New York Legislature in 1857. Its charter provides that the university should be governed by a board of 33 trustees who are empowered to fill their own vacancies. These are private individuals, and there are no representatives of the State of New York. The university, through its trustees, has the power, *inter alia*, to contract and to appoint a president, professors and other instructors as are deemed necessary. The charter further provides:

"The said university shall be subject to the visitation of the Regents of the university of this state in the same manner and to the same extent as the various colleges in this state."

At the present time Alfred University has four colleges: the Graduate School, the Liberal Arts College, the College of Nursing, and the College of Ceramics. Its total budget for 1968–69 is about 6.8 million dollars. Its total enrollment is about 1800 students with some 140 members of the faculty.

The College of Ceramics is operated by the university under a contract with the State of New York. (New York Education Law, McKinney's Consol.Laws, c. 16, § 350(3).) There are about 550 students and about 40 members of the faculty in the Ceramics College. This year the state has appropriated about 1.-8 million dollars for the College of Ceramics.

The state has entered into similar contracts with Cornell University to operate the College of Agriculture, the College of Home Economics, and the School of Industrial and Labor Relations.

Sections 6101 to 6103 of the New York State Education Law relate to the College of Ceramics. Portions of Sections 6102 and 6103 are important for our consideration:

Section 6102 of the Education Law provides:

"Such college shall continue to be administered, as to the establishment of courses of study, the creation of departments and positions, the determination of the number and salaries of members of the faculty and other employees, the apportionment and employment thereof, the maintenance of discipline and as to all matters pertaining to its educational policies, activities and operations, including research work, by Alfred university, as the representative of the state university trustees. All property and equipment acquired for the use of such college shall be the property of the state. Alfred university shall regulate tuition fees at said college after prior consultation with the state university trustees. As the representative of the state university trustees, Alfred university shall also fix the other fees and charges to be paid by the students of the college."

Section 6103 of the Education Law provides:

"The state university trustees shall maintain general supervision over the requests for appropriations, budgets, estimates and expenditures of such college."

All degrees, both graduate and undergraduate, are awarded by the President and Trustees of Alfred University. The selection of faculty for all colleges, the granting of tenure and of promotions to the faculty is administered by faculty committees and the deans of the various colleges, with the approval of the president and Board of Trustees of Alfred University. However, faculty members of the Ceramics College can only receive salary increases if there is adequate monies in the budget approved by the state. Faculty members of the Ceramics College have the option to choose the Alfred University retirement plan or a

state plan, but they invariably select the university plan.

In accordance with the terms of the contract between Alfred and the state, buildings and equipment purchased with state funds remain property of the state. However, Alfred University maintains insurance coverage for the entire university plant, including the Ceramics College.

Students in the Ceramics College take courses in the Liberal Arts College, and some students in the other colleges take courses in Ceramics. All these students pay a general university fee of $100 for health services and cultural programs.

The Ceramics money from the state pays a pro rata share of the administrative cost and physical maintenance of the entire university, including part of the salaries of the Dean of Students, the Registrar, the Treasurer, and other administrative officers. However, Alfred University, without any contact or consultation with the state, determines admission standards, establishes courses of study and degree requirements, promulgates rules of conduct and regulations for the entire university, and generally administers every phase of daily campus life.

The ROTC program, a department of the Liberal Arts College at Alfred, is fully subsidized by the federal government. Colonel Fred Schumacher is head of the department and ranks as a full professor of the university. Participation in ROTC is compulsory for male students during their first two school years but voluntary beyond that. Abolishing this program or making it completely voluntary would pose financial problems to the university because it would then have to substitute an expensive physical education program.

The plaintiffs claim that this court has jurisdiction of this case under Title 28, U.S.C. § 1343(3) and Title 42, U.S.C. § 1983. Section 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

This court must first determine whether it has subject matter jurisdiction of this case under the relevant statutes. The question to be determined then is whether or not Alfred University acted "under color of" state law in suspending the student plaintiffs. If Alfred University did not act under state law, this court lacks jurisdiction to adjudicate the merits of plaintiffs' case.

The concept of "state action" was carefully discussed by Mr. Justice Clark in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L. Ed.2d 45 (1961). Addressing itself to the definition of state responsibility under the Fourteenth Amendment, the court said:

"* * * to fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an 'impossible task' which 'This Court has never attempted.' Kotch v. Board of River Port Pilot Comrs. [for Port of New Orleans], 330 U.S. 552, 556, 67 S.Ct. 910, 912, 91 L.Ed. 1093 [1096]. Only by sifting facts and weighing circumstances * * *." Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

Later in that same opinion, the Court amplified upon the approach to determine state responsibility:

"Owing to the very 'largeness' of government, a multitude of relationships might appear to some to fall within the Amendment's embrace, but that, it must be remembered, can be determined only in the framework of the peculiar facts or circumstances

present." Burton v. Wilmington Parking Authority, 365 U.S. 715, 725–726, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961).

Implementing the approach outlined by the Supreme Court, the court concludes that Alfred University acted as a "private" institution in this situation, and not "under color of" state law. The Alfred University charter indicates by its language the private character of the institution. The New York Education Law, Section 350(3), defines a "statutory or contract college," such as the Ceramics College at Alfred, as a "college[s] furnishing higher education, operated by private institutions on behalf of the state * * *." Admissions standards, degree requirements and courses of study are established by the university. Faculty tenure and promotions are governed by the University President in conjunction with various faculty committees. Finally, the administration of campus life, the day-in and day-out operation of the university, and especially the discipline of the students, is handled exclusively by Alfred University.

On the other hand, there is no question that about one-third of the student body, about one-fourth of total faculty, about one-fifth of the university budget, and about one-tenth of the buildings of Alfred University is connected with or allocated to the Ceramics College. But receipt of state funds for the Ceramics College is simply not sufficient to make Alfred University an instrument of the state for purposes of the Civil Rights Act. "A good deal more," as Judge Frankel put it, must be shown before a private institution will be regarded as acting "under color of" state law. See Grossner v. The Trustees of Columbia University, 287 F.Supp. 535 (S.D.N.Y. 1968). For if state financial aid alone were the test, construction contractors and many other enterprises with extensive contracts with the state would be charged with "state action."

■ In the narrower confines of this case, the court recognizes the right of students to demonstrate and voice opinions on issues of the day. On the other hand, universities for the sake of order may establish reasonable rules of conduct to govern such student activity. See Zanders v. Louisiana State Board of Education, 281 F.Supp. 747 (W.D.La. 1968). It is vital in this case that there is no evidence of state participation in the formulation of the "Policy on Demonstrations" and there is no showing that the Dean's action suspending the seven plaintiffs was taken "under color of any State law, statute, ordinance, regulation, custom or usage." (28 U.S.C. § 1343(3).) There is no evidence showing the slightest contact between the State of New York and the specific action taken against these plaintiffs. The state is certainly not "a joint participant in the challenged activity." Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Finally, the fact that a pro rata share of Dean Powers' salary can be traced to the Ceramics College budget originating from the state is immaterial in the court's opinion.

■ Plaintiffs have invoked many precedents in their argument advocating state action here. After careful consideration, the court concludes that these cases are not persuasive. A state cannot deprive a person of his rights secured under the Constitution by means of its courts or its laws. See Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968) (State could not delegate power to its courts to grant injunctions to restrict reasonable exercise of first amendment rights by use of its trespass laws.); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L. Ed. 265 (1946) (Similar to *Logan Valley* * * * use of state trespass statute to restrict first amendment rights); Boman v. Birmingham Transit Co., 280 F. 2d 531 (5th Cir. 1960) (discriminatory bus regulations enforceable by force of the criminal law); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 803 (1967) (A state constitutional pro-

vision negating the effect of state anti-discrimination statutes); Griffin v. Maryland, 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964) (state action found where special deputy sheriff acting under authority of state arrested Negroes in amusement park).

The plaintiffs rely upon general language used in the *Burton* case, supra, to advance their theory of "state action." The court stated that state action exists when "to some significant extent the State in any of its manifestations has been found to have become involved." Further, state action exists when "the State * * * so far insinuated itself into a position of interdependence * * that it must be recognized as a joint participant in the challenged activity * * *."

This language, however, must be read in the context of the facts. A lessee who operated a restaurant in a parking building owned and operated by a state agency refused service to Negroes. Neither the lease nor state statute compelled service to all persons. The Supreme Court, in a holding limited to the facts in *Burton*, found state action.

In some of these cases, the state was a joint participant either because of the activities of its officers (*Griffin*), or because of its failure to act in a notorious and clearly discriminatory situation which had persisted over a long period of time (*Burton*). In the others, the state was connected with the challenged activities through its statutes or ordinances (*Logan Valley*).

Therefore, the Court finds that it does not have jurisdiction under the relevant federal statutes. Because of this it is not necessary or proper to discuss the merits of the controversy between the student plaintiffs and the University.

This decision constitutes the findings of fact and conclusions of law.

All causes of action set forth in plaintiffs' complaint, including actions for declaratory judgment and money damages, are dismissed and the application for a temporary injunction is denied.

*APPENDIX 1*

ALFRED UNIVERSITY
POLICY ON DEMONSTRATIONS

Effective January 1, 1968

The University cherishes the right of individual students or student groups to dissent and to demonstrate, provided such demonstrations do not disrupt normal campus activities, or infringe on the rights of others. In fact, the University is proud that some students care enough about world issues that they feel compelled in conscience publicly to proclaim their views.

On the other hand, the University cannot condone student or faculty groups which, under the banner of free speech, proceed to violate the freedom of speech, choice, assembly, or movement of other individuals or groups. In short, responsible dissent carries with it a sensitivity for the civil rights of others, and a recognition that other students have a right to dissent from the dissenters.

Accordingly, the University will in any given instance take whatever steps it deems necessary to (1) protect the right of any group to demonstrate and publicly proclaim any lawful view, however unpopular; (2) protect the freedom of speech, assembly, and movement of any group which is the object of demonstrations.

To achieve the foregoing ends, demonstrating groups will be expected to adhere to the following guidelines: (1) reasonable access to and exit from any office or building must be maintained; (2) physical harassment and verbal abuse are to be avoided; (3) demonstrators must keep at a sufficient distance to assure reasonable privacy for the student job-seeker who wishes to discuss his personal career plans with a recruiter; (4) demonstrators must avoid crowding so close to the object of protest that breach of the peace is risked or encouraged; (5) demonstrators must not attempt to force the cancellation of an event sponsored by a University office or by a faculty or student group;

(6) care must be taken to avoid disrupting classes or other educational activities; (7) where an invited speaker is the object of protest, students and faculty may demonstrate *outside* the building where the lecture will take place. Demonstrators who wish to enter the building must do so as members of the audience; as such, they must leave all signs outside and must give the speaker a respectful hearing; (8) groups who wish to demonstrate must inform the Dean of Students' Office, 48 hours in advance, of the locale of the demonstration and the object of intended protest. Leaders of intended demonstrations are free to confer in advance with Dean of Students' staff, in order to minimize the possibility of breaking the stated guidelines.

In the instance of any given demonstration, the judgment as to whether the guidelines are being observed will be made on the spot by the Dean of Students or his designate, *not* by the demonstrators or by those being demonstrated against.

If at the time of the actual demonstration the Dean of Students or his designate judges that the above guidelines are being breached, he will courteously request the demonstrators to bring their procedures into accord with the guidelines. Under such circumstances, demonstrators will be expected to comply immediately. (If they view the request as unreasonable, they may appeal later to the President for a ruling.) Should the demonstrators decline to follow the Dean's request, they will be immediately suspended pending a group hearing within twenty-four hours.

The review board for this hearing will consist of one member of the Dean of Students' staff (not the dean who suspended the students), one academic dean, the faculty chairman of the Student Life Committee, the chairman of the University Faculty Council, and the president of the Student Senate. The chairman of the Student Life Committee will serve as chairman of the review board. At the judgment of the chairman, the proceedings may be limited to one hour. Both the review board and the suspended students may bring to the hearing a maximum of three witnesses and/or advisers. The only relevant issue at this hearing will be: Did the suspended students follow or decline to follow the dean's request that they modify their demonstration procedures? If the hearing upholds the suspension, the students involved will be separated forthwith. Similar procedures will apply to faculty who decline to follow the stated guidelines.

Police will not be called onto the campus unless there is clear danger to life or to property, or unless non-Alfred University groups disrupt University operations and fail to comply with the stated guidelines when requested.

Leland Miles<br>President