**CHICAGO JOINT BOARD, AMALGAMATED CLOTHING WORKERS OF AMERICA, AFL–CIO, Plaintiff-Appellant,**

**v.**

**CHICAGO TRIBUNE COMPANY, Chicago American Publishing Company and Field Enterprises, Inc., Defendants-Appellees.**

**No. 18300.**

United States Court of Appeals, Seventh Circuit.
Dec. 17, 1970.

R. Dickey Hamilton, Milton I. Shadur, Robert Plotkin, Stuart R. Cohn, Chicago, Ill., for plaintiff-appellant; Devoe, Shadur, Plotkin, Krupp & Miller, Chicago, Ill., of counsel.

Sherman Carmell, Marshall Patner, David Goldberger, Sheldon M. Charone, Frances Sebastian, Chicago, Ill., amicus curiae; Carmell & Charone, Richard Stillerman, Chicago, Ill., of counsel.

A. Daniel Feldman, Robert B. Wilcox, David L. Lange, Linda R. Hirshman, Chicago, Ill., for Field Enterprises, Inc.;

Isham, Lincoln & Beale, Chicago, Ill., of counsel.

Don H. Reuben, Lawrence Gunnels, Chicago, Ill., for defendants-appellees Chicago Tribune Co. and Chicago American Pub. Co.; Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., of counsel.

Before CASTLE, Senior Circuit Judge, and KILEY and CUMMINGS, Circuit Judges.

CASTLE, Senior Circuit Judge.

Plaintiff-appellant, Chicago Joint Board, Amalgamated Clothing Workers of America, AFL–CIO, prosecutes this appeal from the order of the District Court granting summary judgment to the defendants-appellees, Chicago Tribune Company, Chicago American Publishing Company, and Field Enterprises, Inc., in the Union's action against said defendant newspaper publishers. The Union's complaint, as amended, seeks injunctive relief to compel the defendants to publish an editorial advertisement tendered by the Union; the recovery of compensatory and punitive damages for defendants' refusals to publish such advertisement; the entry of a declaratory judgment declaring that defendants may not arbitrarily refuse to publish advertisements expressing ideas, opinions or facts on political or social issues and that defendants may not refuse to publish such advertisements if they are lawful and the party submitting the advertisement is willing to pay the usual rate and there is no technical or mechanical reason why the advertisement cannot be published; and that defendants be permanently enjoined from refusing to publish such lawful advertisements. Count I of the complaint, which seeks injunctive relief to compel publication of the specific advertisement tendered by the Union, and Count IV which seeks declaratory relief, assert a right in the Union [1] under the First and Fourteenth Amendments to compel the defendant newspaper publishers to accept its lawful editorial advertisements for publication at the usual rates for such advertisements. Counts II and III assert, respectively, alleged breach of contract and the Union's justifiable reliance upon the defendants' representations.

The District Court in granting defendants' motions for summary judgment found no genuine material issue of fact presented by the pleadings, affidavits, depositions and other materials before the court for consideration in connection with the motions, and concluded that absence of state action deprived the court of jurisdiction and no other claim is stated upon which relief might be granted. The appeal herein is grounded on the assertion that the court erred in its conclusion that defendants' refusals to publish the advertisement did not involve state action.

The Union is a Chicago labor union which represents clothing and garment workers. It has conducted a campaign to limit the importation of foreign-made clothing into the United States on the grounds that the importation and sale of such clothing reduces the number of jobs available to its members. The campaign included picketing directed against Marshall Field & Co., the operator of a large Chicago department store which retails imported clothing and utilizes the advertising columns of the defendants' newspapers to advertise such merchandise.

The defendants Chicago Tribune Company and Chicago American Publishing Company each publish a Chicago newspaper: The Chicago Tribune and Chicago Today, respectively. The defendant Field Enterprises, Inc. is the publisher of The Chicago Sun-Times and The Chicago Daily News. There are no newspapers with general circulation throughout the Chicago metropolitan area other than the four newspapers owned and published by the defendants.

The Union, in an attempt to communicate its position to the general public in the Chicago metropolitan area and to the same readers who are exposed to Mar-

1. And in all others similarly situated on whose behalf it also sues under Count IV.

shall Field & Co.'s advertisements, submitted to each of the defendants' four newspapers a full page advertisement which depicted a picket line beneath a representation of the Marshall Field's clock (an identifying feature of the Chicago department store), explained why the Union was picketing the Marshall Field & Co. store, and set forth the Union's basis for its opposition to the sale of imported foreign-made clothing. Each of the newspapers refused to publish the advertisement. Each reserves the right to reject any advertisement.[2]

The Union recognizes that with respect to the claims it asserts in Counts II and III of its complaint it must rely wholly on the doctrine of pendent jurisdiction, that these counts afford no independent basis for federal jurisdiction, and their justiciability in a federal court action depends upon whether Counts I and IV state a federal claim.

The Union contends that Counts I and IV of its complaint allege facts which establish a violation of rights guaranteed it by the First and Fourteenth Amendments, and therefore state a federal claim cognizable by the District Court in the exercise of that court's jurisdiction conferred by 28 U.S.C.A. §§ 1331 and 1343(3), because the factual allegations require a conclusion that the defendants' rejections of its editorial advertisement involved state action. In this connection the Union points to what it characterizes as a special relationship between the defendants' newspapers and the State arising from Illinois statutory provisions exempting newspaper employees from jury service;[3] requiring newspaper publication of certain legal notices,[4] notices of election[5] and municipal ordinances;[6] and excluding the purchase, employment and transfer of such tangible personal property as newsprint and ink for the primary purpose of conveying news from the incidence of retailers' occupation, use and service use taxes;[7] from the Chicago city ordinance restricting newsstands permitted on public streets to the sale of daily newspapers printed and published in the city;[8] and from the custom of providing a designated space in public buildings for the news-gathering use of representatives of the press and other news media. It is urged that because the defendants, taken together, comprise the entire newspaper publishing industry with newspapers of general circulation throughout the Chicago metropolitan area, and are the recipients of economic benefit and favored treatment flowing from public sources as the result of the statutes, ordinance and custom above mentioned, their relationship to the State is such that there is "state involvement" in the operation of defendants' newspapers under the rationale relied upon by the Supreme Court of the United States to make conduct of a private business or enterprise subject to Fourteenth Amendment or other constitutional restrictions directed to state action. Cases cited as expressing that rationale include Marsh v. Alabama, 326

---

2. The Field Enterprises, Inc. newspapers gave as a reason for its refusal a policy not to print advertisements naming others unless they consent to being named. The Chicago Tribune and Chicago Today stated its refusal was based on its conclusion the tendered advertisement failed to meet standards prescribed in the newspapers' Advertising Acceptability Guide which provide for the rejection of an advertisement which in the newspapers' judgment "reflects unfavorably on competitive organizations, institutions or merchandise" or is "misleading", but further "reserves the right to reject any advertising which in its opinion, is unacceptable". The policy and the standards alluded to apparently provide norms for the rejection of specific types of advertising but they in no manner negate the reservation made by each defendant to reject any advertisement.

3. Ill.Rev.Stat.1969, ch. 78, § 4.

4. Ill.Rev.Stat.1969, ch. 110, § 14.

5. Ill.Rev.Stat.1969, ch. 105, § 2–12; ch. 7½, § 2 and others.

6. Ill.Rev.Stat.1969, ch. 24, § 1–2–4.

7. Ill.Rev.Stat.1969, ch. 120, § 440, § 439.2 and § 439.32.

8. Municipal Code of the City of Chicago, § 34–12.

U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265; Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152; Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 and Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603. And, Marjorie Webster Junior College, Inc. v. Middle States Association of Colleges and Secondary Schools, Inc. (D.C.D.C. 1969) 302 F.Supp. 459 is pointed to as a recent application of such rationale.

But analysis of the foregoing argument on the basis of the controlling facts here involved reveals that the premises upon which it is constructed are unsound; that the conclusion drawn that there is "state involvement" in the operation of defendants' newspapers, or in the formulation or application of defendants' policies with respect to the acceptance or rejection of editorial advertising, is wholly unwarranted; and that the decisions cited in support thereof are inapposite.

And, this appears to be especially so when the relevance of the argument advanced is viewed and measured against the background of the traditional concept of the role of the press in our society. In this latter connection the District Court in the memorandum opinion it filed aptly observed:

> "Rather than regarded as an extension of the state exercising delegated powers of a governmental nature, the press has long and consistently been recognized as an independent check on governmental power. 'The right of free public discussion of the stewardship of public officials was * * *, in Madison's view, a fundamental principle of the American form of government.' New York Times Co. v. Sullivan, 376 U.S. 254, 275 [, 84 S.Ct. 710, 11 L.Ed.2d 686] (1964). So it is that the national policy favoring full and frank exercise of the press' freedom 'may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials.' Id. at 270 [, 84 S.Ct. at 710.]

See Chafee, Free Speech in the United States 19, 21–22, 29 (1954).

> In sum, the function of the press from the days the Constitution was written to the present time has never been conceived as anything but a private enterprise, free and independent of government control and supervision. Rather than state power and participation pervading the operation of the press, the news media and the government have had a history of disassociation."

With this in mind, we turn to consideration of the decisions which are cited to us as enunciating the standards which are to be applied for the purpose of determining whether there is such state involvement in a private business or enterprise that the latter's action becomes state action within the purview of the restrictions imposed by the First and Fourteenth Amendments.

In Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265, it was held that a "company town" which had assumed a role virtually indistinguishable from any other publicly-incorporated municipality of the state also acquired the state's obligation to allow reasonable access to its streets for the free expression of thought. The Court reasoned (326 U.S. at 506–507, 66 S.Ct. at·278):

> "Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.
>
>    *    *    *    *    *    *
>
> Whether a corporation or a municipality owns or possesses the town the public has an identical interest in the functioning of the community in such manner that the channels of communication remain free."

and held that the company's refusal to permit the use of its streets for the distribution of religious literature violated the Fourteenth Amendment.

More recently, in Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603, the rationale of *Marsh* was extended to a privately-owned shopping plaza which had assumed the status ordinarily associated with a city's central business district. The shopping plaza was held subject to the requirement that its sidewalks and parking area roadways, to which the general public had unrestricted access, be made available to pickets as in the case of other essentially public sidewalks and roadways.

The sidewalks and streets of a company town or a shopping center bear little analogy to the printing press, its product, and the distribution system of a newspaper publisher. Unlike the company town or the shopping center, none of the defendants has consented to unrestricted access by the general public to its advertising columns or pages. Such access is a matter of private contract. Nor in the publication of its newspapers has any of the defendants assumed the performance of a public function which carries with it a concomitant obligation to each member of the general public.

Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152, involved the refusal of a private political association to permit otherwise qualified Negroes to participate in private elections which action, for all practical purposes, deprived them of effective participation in a public election. The candidate who won in the privately conducted primary filed as a candidate in the subsequent primary of the dominant political party and invariably won there and in the general election. The Court in holding the action of the private political association, the Jaybird Party, violated the Fifteenth Amendment, pointed out (345 U.S. at 469, 476 and 477, 73 S.Ct. at 817):

"The Jaybird primary has become an integral part, indeed the only effective part, of the elective process that determines who shall rule and govern in the county.

\* \* \* \* \* \*

The exclusion of Negroes from meaningful participation in the only primary scheme set up by the State was not an accidental, unsought consequence of the exercise of civic rights by voters to make their common viewpoint count. It was the design, the very purpose of this arrangement that the Jaybird primary in May exclude Negro participation in July. That it was the action in part of the election officials charged by Texas law with the fair administration of the primaries, brings it within the reach of the law. The officials made themselves party to means whereby the machinery with which they are entrusted does not discharge the functions for which it was designed.

\* \* \* \* \* \*

The evil here is that the State, through the action and abdication of those whom it has clothed with authority, has permitted white voters to go through a procedure which predetermines the legally designed primary."

We perceive no relevance of *Terry* to the facts here involved. There is no claim or indication that there is present any intermeshing of action or non-action by public officials with the action of the defendants in rejecting the tendered advertisement pursuant to a design or purpose to frustrate any First or Fourteenth Amendment right of the Union.

In Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45, a municipal parking authority created as an agency of the State of Delaware leased a portion of its parking facility building to a restaurant concessionaire. The restaurant refused to serve Negroes. In holding that such discrimination violated the Fourteenth Amendment, the Court took occasion to observe (365 U.S. at 722, 81 S.Ct. at 860):

" \* \* \* [T]o fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an 'impossible

task' which 'This Court has never attempted.' Kotch v. Board of River Port Pilot Com'rs, 330 U.S. 552, 556, 67 S.Ct. 910, 912, 91 L.Ed. 1093. Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."

But the Court then pointed to numerous direct ties and relationships between the state agency and its concessionaire-lessee. The Court noted that the land and building were publicly owned and under the enactment providing for the creation of the Authority the building was dedicated to "public uses" in performance of the Authority's "essential governmental functions" ; that the commercially leased areas constituted a physically and financially integral and, indeed, indispensable part of the State's plan to operate the project as a self-sustaining unit; that upkeep and maintenance of the building, including necessary repairs, were responsibilities of the Authority and were payable out of public funds; and that guests of the restaurant are afforded a convenient place to park their automobiles, and, similarly, patrons of the parking facility are provided with a convenient place to dine. The Court concluded (365 U.S. at 724–725, 81 S.Ct. at 861) that:

> "Addition of all these activities, obligations and responsibilities of the Authority, the benefits mutually conferred, together with the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service, indicates that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn.

> \* \* \* \* \* \*

> The State has so far insinuated itself into a position of interdependence with Eagle [the restaurant] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to

fall without the scope of the Fourteenth Amendment."

It is obvious from the facts involved in the instant case that there is no direct tie between any of the defendants and the State or any of its agencies either in the operation of the defendants' newspapers or in the refusals of the newspapers to publish the advertisement the Union proffered. And there is no relationship between the defendant newspaper publishers and the State comparable with that which was found in *Burton* to be a joint participation in the challenged activity and state involvement to a degree which amounted to state action.

In Marjorie Webster Junior College, Inc. v. Middle States Association of Colleges and Secondary Schools, Inc., D.C. Cir., 432 F.2d 650 the District Court had held that a regional educational association responsible for the accreditation of colleges and secondary schools, which the court found to be acting "in a quasi-governmental capacity by virtue of its role in the distribution of Federal funds under the 'aid to education statutes' " was subject to constitutional restraints in the performance of its accreditation function and was precluded from denying accreditation to a proprietary school solely because the school was not a non-profit institution (302 F.Supp. 459, 469–471). The Court of Appeals in reversing the District Court on the ground that, *inter alia*, the conduct of the association satisfied constitutional requirements, stated (432 F.2d 650, 658):

> "We may assume, without deciding, that either the nature of appellant's activities or the federal recognition which they are awarded renders them state action subject to the limitations of the Fifth Amendment."

But the defendant newspaper publishers clearly are not engaged in the exercise of any governmental function, nor do they possess or exercise any delegated power of a governmental nature.

The Union, however, points to language used by the District Court in *Marjorie Webster* which the Union takes as characterizing the association there in-

volved as one which "enjoys monopoly power in an area of vital public concern" (302 F.Supp. 459, 469) [9] and contends that this expression recognizes the existence of an additional standard which is to be equated with state action as a basis for subjecting private conduct to restraints imposed by the First and Fourteenth Amendments. But the context from which the Union borrows the expression indicates that it was used with reference to common-law justification for judicial intervention in the internal affairs of a private voluntary association, rather than as a recognition of an independent basis for subjecting private conduct to federal constitutional limitations. Apart from the question of the appropriateness of the use of such a standard for the latter purpose if the monopoly is not one conferred by the State or does not involve the exercise of a quasi-governmental function, a question we need not here decide, it has no application in the instant case. Neither Field Enterprises, Inc. nor the Chicago Tribune Company [10] enjoys a monopoly in the relevant market area, i. e., the Chicago metropolitan area. The circulation figures for each of the four newspapers published by the defendants (each publishes two newspapers) are set forth in the Union's complaint. The figures clearly establish that neither of these defendant publishers approaches a monopoly position. The figures reflect a relatively high degree of competition between the defendants rather than monopoly control by one of them. And there is no allegation, nor is there any indication in the record, that there was any concert of action between these competitors in the refusal of each of them to accept the Union's advertisement for publication. There was no individual "monopoly power", and there was no exercise of monopoly power by means of combination.

■ The cases relied upon by the Union have no meaningful application to the facts and circumstances here involved. And they reflect no rationale which would afford a basis for concluding that the jury service exemption; the receipt of revenue from publishing legal notices, election notices, and ordinances; the use tax exemption on purchases of newsprint and ink; the ordinance restricting sidewalk newsstand vendors to the sale of local newspapers; and the presence of press facilities in public buildings, either singly or collectively represent that state participation or state involvement which serves to color private conduct with the hue of state action.

■ The use tax exemption, which newspapers share in common with magazines and periodicals (Time, Inc. v. Hulman, 31 Ill.2d 344, 201 N.E.2d 374), does represent a "state involvement" in the limited sense that any tax exemption does, but not to a degree which constitutes state participation in the conduct or action of the enterprise granted the exemption. Cf. Walz v. Tax Commission of City of New York, 397 U.S. 664, 90 S. Ct. 1409, 25 L.Ed.2d 697.

None of the other factors mentioned in any manner approaches either state involvement or state participation. The jury service exemption runs to the individual newspaper employee.[11] If he chooses to assert the exemption there may be some indirect incidental benefit to his employer, the publisher, in that any operating inconvenience the employee's absence might occasion is avoid-

9. Admittedly, the context from which the Union borrows the expression concerned an "area of vital public concern", the accreditation of educational institutions, and the association was the sole accrediting agency for the colleges and secondary schools of the region.

10. It appears that American Publishing Company, the additional defendant and publisher of Chicago Today, is a wholly owned subsidiary of the Chicago Tribune Company. For the purpose of this part of our opinion we treat these two companies as one publisher.

11. Ill.Rev.Stat.1969, ch. 78, § 4 exempts from jury service, among others, "persons actively employed upon the editorial or mechanical staffs and departments of any newspaper of general circulation printed and published in this state".

ed. But its impact ends there. It imparts no gloss of state involvement in the publisher's business or participation in the publisher's conduct. Likewise, revenue derived from publication of notices and ordinances, even if substantial, evidences no such effect. The State has no stake in the publisher's profit or lack thereof. The regulatory ordinance confining sidewalk newsstand vendors to the sale of local newspapers has no direct application to the defendants. It regulates the use of streets and sidewalks by vendors for the convenience of the public. It accommodates a primary interest of the public by providing convenient and ready access to a service—the supplying of local newspapers—without burdening the streets and sidewalks with vending stands offering other newspapers and periodicals for which there is less demand. The ordinance is of direct benefit to the public. It balances control of the streets and sidewalks for their primary use with a limited other use thereof in serving a public interest. If the restrictions of the ordinance are of any real benefit to the defendants it is merely incidental and, in our opinion, beside the point. The custom of providing space in public buildings for the news-gathering media is, likewise, an accommodation made to serve public convenience—not the newspapers—so that the government's activities can be freely and quickly reported with a minimum of interference with or disruption of the public's business.

We conclude that the Union's contentions are without merit.

 The additional arguments advanced by *amici curiae* are equally unconvincing. It is urged that the privilege of First Amendment protection afforded a newspaper carries with it a reciprocal obligation to serve as a public forum, and if a newspaper accepts any editorial advertising it must publish all lawful editorial advertisements tendered to it for publication at its established rates. We do not understand this to be the concept of freedom of the press recognized in the First Amendment. The First Amendment guarantees of free expression, oral or printed, exist for all—they need not be purchased at the price *amici* would exact. The Union's right to free speech does not give it the right to make use of the defendants' printing presses and distribution systems without defendants' consent.

The other contention advanced by *amici* is that in the context of the labor dispute private business rights of a neutral third party may be affected with a public interest which requires that the business (here the newspapers' advertising pages) be opened up to the labor organization for First Amendment purposes. We glean nothing from the constitutional guarantees, or from the decisions expository thereof, which suggests that the advertising pages of a privately published newspaper may so be pressed into service against the publisher's will either in the context of a labor dispute to which the publisher is not a party or otherwise.

The judgment order appealed from is affirmed.

Affirmed.