## THE WHISTLER.

### (District Court, D. Oregon. August 31, 1882.)

**1. PLEADINGS.**

New matter in an answer constituting a defensive allegation should be articled and pleaded separately, and not blended with the response to any article of the libel.

**2. EXCEPTIONS.**

Exceptions to an answer for insufficiency and impertinence are taken for entirely different causes, and therefore they ought not to be taken to the same matter, either conjunctively or disjunctively.

**3. PILOT SERVICE—PLACE OF TENDER OF.**

A state may permit or require its pilots to tender their services to inward-bound vessels at a greater distance from the shore than three miles, or the outward limit of the pilot ground.

**4. SAME—OFFER OF, WHEN SUFFICIENT.**

The bark Whistler was approaching the mouth of the Columbia river with intent to enter and load there as soon as one of the three pilot tugs stationed there should come out to her without orders to go elsewhere, and being met by one of said tugs, without such orders, she was taken in tow thereby, and went in; but on the day before, and while she was standing off and on about 30 miles from the bar, she was hailed by an Oregon schooner pilot, who tendered his services to pilot her in, which were refused. *Held,* that the vessel was "bound in the river," within the meaning of the statute giving full pilotage for the offer and refusal of such services, and, having afterwards gone in, the libelant became entitled to such pilotage.

*Frederick R. Strong,* for libelant.

*John W. Whalley,* for claimant.

DEADY, D. J. The libelant, George W. Woods, brings this suit to enforce a lien upon the American bark Whistler for the sum of $72, for pilotage, arising, as he alleges, as follows: On March 18, 1882, the libelant, being a duly-licensed pilot under the laws of Oregon for the Columbia river below Astoria, hailed the said vessel and offered to pilot her across the bar of said river to Astoria, she being then in the open sea outside of said bar, drawing nine feet of water, and bound for said port, which offer the master of said vessel declined; but afterwards, on the same day, "entered said port" under the charge

of another pilot, by reason whereof the libelant became and is en·· titled to full pilotage—eight dollars per foot draught—from said vessel.

The answer of the claimant, A. M. Simpson, admits the offer and refusal of the libelant's services, but denies that the vessel was then upon the pilot ground, or bound for the port of Astoria, or that she ever entered the same, or that the libelant made the first offer to pilot her; and alleges that on March 6th the Whistler sailed from San Francisco on "a coasting voyage, bound to the mouth of the Columbia river for orders," to be there received from one of the three tugs, naming them, to the effect that he was to take his vessel to Puget Sound or into the Columbia river, and if no orders were received from either of said tugs, the vessel was to proceed to Knappton, Washington Territory, in tow of the first one that came to her, and there load with lumber for San Francisco; that when the libelant hailed the vessel "she was lying off and on about 30 miles from the mouth of the Columbia river, awaiting the arrival of one of the said tugs," and had not received orders from any of them as to "his future course;" and that on March 19th one of said tugs hailed said·vessel, without orders, whereupon, in pursuance of his sailing directions, the master of the latter requested the tug to tow him to Knappton, which was done, when he loaded with lumber for San Francisco.

The libelant excepts to portions of the answer, setting them out in extenso, as insufficient, irrelevant, and impertinent.

The answer is not articled, but run together in a continuous statement, without special references to the articles of the libel to which it relates, but the portions excepted to may be briefly referred to as follows: (1) The denial that the vessel was bound to Astoria or that she entered there; (2) the allegation that she came to the mouth of the river under directions to take orders for her future course from one of the tugs; and (3) that she had not received her orders when hailed by the libelant, but entered the river afterwards in pursuance of the same and loaded with lumber at Knappton.

An exception to an answer in admirality ought to specify whether it is taken for insufficiency or impertinence. They are very different grounds, and an exception to an allegation for both causes on one or the other of them is not good pleading. The former is only allowed upon the ground that the answer, so far as excepted to, is not a full and explicit response to the allegation or allegations of the libel, while the latter merely raises the question of whether the answer is a response and defense to such allegation. *The California,* 1 Sawy. 465.

The first of these exceptions is not well taken, in any view of the matter. The allegations excepted to are clear and explicit, and in direct response to the answer.

If the libelant is of the opinion, as he well may be, that it is immaterial in this case whether the Whistler was bound to Astoria or did go there, so that she entered the river, he should not have alleged the fact in his libel. Having made the allegation and called upon the claimant to answer, he cannot object that it is impertinent, even if the allegation and answer are both immaterial. The only way to get rid of the matter, if it is thought desirable, is to amend the libel and omit it.

The matter embraced in the second and third exceptions is a defensive allegation, and, however sufficient as such, is liable to an exception for impertinence, because not separately pleaded, but blended with the matter in response to the libel. Id.

But the exceptions were argued by counsel without reference to this point, and will be so considered.

If the offer of the libelant to pilot the Whistler was a valid one, the liability of the vessel to him for full pilotage is not denied.

The pilot law of Oregon (Gen. Laws, 708) provides that the master of a vessel may pilot her "from outside the Columbia river bar into said river," but he shall "pay to such pilot as shall first offer his services outside of the bar full pilotage," which, by the same law, (p. 707,) is eight dollars per foot draught for the first twelve feet.

Some effect prejudicial to the offer of the libelant is attempted to be given by the answer to the fact, as therein alleged, that it was made at some distance beyond the bar—say 30 miles. No authority has been cited on the point, and but little attention paid to it on the argument. There is no provision in the Oregon law defining the limit of the bar pilot ground outwardly, further than what is implied in the use of the phrase "Columbia-river bar," (Gen. Laws, 706;) but it is implied, both from usage and the law, that a pilot may cruise beyond that, for it is provided, (Id.,) that the pilots on the bar shall keep a seaworthy boat "to cruise outside the bar," and an incoming vessel is made liable for full pilotage to the first pilot who offers his services outside of the bar." Id. 708.

While it may be that the state cannot extend the pilot ground at the mouth of the river indefinitely into the sea, and probably not further than three miles beyond the headland, it does not follow that she may not permit and require her pilots to cruise for vessels at a

much greater distance from the shore, nor that an offer of pilot service to be performed on the pilot ground, made at such distance, to a vessel bound in the river, is not valid and effective, as if made within three miles of the shore.

In *Lea* v. *Ship Alexander*, 2 Paine, 468, Mr. Justice Wayne says that the term "cruising ground" is not synonymous with "pilots' water or pilotage ground."

"By pilots' cruising ground is meant that distance out in the sea along a certain extent of coast that pilots cruise for vessels bound to ports, inlets, harbors, rivers, or bays into which a pilot may take them by his commission. By pilots' water or pilotage ground is meant the access to a bay, inlet, river, harbor, or port, beginning at the exterior point where a pilot may take leave of an outward-bound vessel, and extending to the place fixed upon by law or usage for the anchorage or mooring of inward-bound vessels."

In *Horton* v. *Smith*, 6 Ben. 264, Judge Benedict, in considering this question, says:

"It is the policy of most pilot laws to induce the pilots to make an early tender of their services to inward-bound vessels. * * * State boundaries have been sometimes considered as furnishing the outward limit, (1 Daly, 185,) although Sandy Hook pilots are sought for, and their services taken much further out than a marine league. In France it has been adjudged, in regard to vessels bound to Havre, that the pilots may board such vessels at any time or distance out, and the liability to take a pilot has been adjudged to attach to a French ship although she was at the time in English waters, as at the Downs. Cour. Cass. D. 1866, p. 303; Caumonte, Traite Pilote, 31."

The offer, in my judgment, is not insufficient on account of the place where it was made. Was the offer invalid because of the direction to the master not to enter, if he got orders by the tug to go elsewhere? I think not. The Whistler was bound in the Columbia river, subject to a contingency that never happened, and she came in. No order was received from the tug, and the vessel, in pursuance of the purpose with which she came to the bar, went into the river on the voyage in which she received the offer of pilot service from the libelant. The offer of pilot service was made upon the assumption that the vessel was then bound in the river, and also upon the contingency that she would go in. If she met orders at the mouth that turned her back, or was foundered or blown away before the pilot service was or could be performed, then the offer went for naught. But the offer having been made while the vessel was on her way to and approaching the mouth of the river with the intent to enter, unless turned away by a contingency which did not happen, to-wit, an order from the tug, and having entered in pursuance of such purpose, it

is, in my judgment, an offer of pilot service within the letter and spirit of the law, and, being refused, entitles the libelant to full pilotage.

If the law were otherwise, it would be very easy to have an understanding between coasters and the tugs at the mouth of the river by which the pilots who cruise for vessels in a pilot boat outside would be unjustly deprived of all benefit of their enterprise in hailing vessels beyond the bar, in favor of the tug pilots who wait inside in ease and safety until they are signaled by the approaching vessel. All that is necessary is to give the master directions on leaving port not to go into the river until met by a tug, and then to go in with the tug and its pilot, unless he there receives orders to the contrary—orders which he is certain not to receive, and no one ever expected he would.

Indeed, when all the circumstances are considered,—those of general notoriety as well as those set out in the pleadings,—it is difficult to avoid the conclusion that this defense is a mere preconcerted device to prevent the schooner pilots from making an effectual offer of pilot service to the Whistler before she was taken in tow by the tug, as per previous arrangement with the owners of both.

The exceptions are allowed.