## THE SWIFT ARROW.

(District Court, D. Massachusetts.  September 26, 1923.)

No. 2193.

1. **Pilots ⊚⇒7—Obligation to take pilot; port situated on boundary waters between states.**

Under Rev. St. § 4236 (Comp. St. § 7982), providing that the master of a vessel bound to a port "situate upon waters which are the boundary between two states may employ any pilot duly licensed or authorized by the laws of either of the states bounded on such waters," such waters must be in a real and substantial way the boundary between two jurisdictions.

2. **Pilots ⊚⇒7—Obligation to take pilot; federal statute held inapplicable.**

Such statute does not apply to a port in Massachusetts situated on waters of Narragansett Bay; the boundary between Massachusetts and Rhode Island there being an arbitrary line, crossing waters of the bay or its branches at certain places, but having no relation to such waters as a boundary.

3. **Pilots ⊚⇒8—Offer of services need not be within waters of his state or port.**

A pilot's offer of his services need not be made within the territorial waters of his state or port.

4. **Pilots ⊚⇒10—Pilot whose services were refused held entitled to pilotage fees.**

A Massachusetts pilot, whose offer of services to a vessel bound for Fall River was refused, *held* entitled to recover pilotage fees under G. L. Mass. c. 103, though the offer was made when the vessel was 24 miles from port, in Narragansett Bay, in waters of Rhode Island.

In Admiralty.  Suit by George A. Adams against the steamship Swift Arrow.  Decree for libelant.

George L. Dillaway, of Boston, Mass., for libelant.

George H. Raymond, of Providence, R. I., and Eugene T. Connolly, of Boston, Mass., for claimant.

MORTON, District Judge.  The case presents an interesting question about pilotage.  The facts, which are agreed upon, are briefly as follows:

The libelant, Adams, was a Massachusetts pilot, duly licensed for the port of Fall River.  On April 4, 1922, he hailed the Swift Arrow, when about 3 miles outside of Brenton's Reef lightship, and offered his services as a pilot.  They were refused.  Brenton's Reef lightship is stationed over a mile offshore at the eastern entrance to Narragansett Bay.  The Swift Arrow was about 24 miles from Fall River, the port to which she was bound, when Adams hailed her, the intervening waters being entirely within the state of Rhode Island.  After refusing the services of Adams, the Swift Arrow employed a Rhode Island pilot, who took her to her destination.

[1, 2] Under the law of Massachusetts the Swift Arrow was obliged to accept the first pilot licensed for the port of Fall River who offered his services, or else to pay his pilotage fees if his services were refused.  Gen. Laws Mass. c. 103.  Under the provisions of the federal statute, she was at liberty, if bound to a port "situate upon waters which are the boundary between two states," to "employ any pilot duly licensed or authorized by the laws of either of the states bounded on such waters."  Rev. Stats. § 4236 (U. S. Comp. Stats. § 7982).

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The principal question is whether the port of Fall River is situated upon waters which are the boundary between Massachusetts and Rhode Island. It is to be decided upon the government charts put in evidence and the statements in the agreed facts. As the chart shows, Narragansett Bay and Mt. Hope Bay, which is an arm of it, are surrounded by Rhode Island, except at the sea entrance and at the northeast corner. Around the mouth of Taunton river is a comparatively short stretch of shore belonging to Massachusetts. (For the very interesting history of how this came about, the Massachusetts view, at least, see Mass. Sen. Doc. 34, p. 6, 1832.[1]) The boundary between the states is an arbitrary line which disregards the bay and is not based on the presence of navigable waters or the configuration of the shore. The port of Fall River—i. e., the waters where vessels doing business in that city customarily lie—is entirely within Massachusetts.

In Leech v. Louisiana, 214 U. S. 175, 29 Sup. Ct. 552, 53 L. Ed. 956 (1908), it was held that, although the Mississippi river was for some distance the boundary between Mississippi and Louisiana, nevertheless a Mississippi pilot had no right to take vessels into the port of New Orleans, where the river is wholly within the state of Louisiana. The court said:

"The limit of the waters referred to [i. e., boundary waters under the statute] is the point at which they cease to be a boundary between two states. Neither continuity of water nor identity of name will carry them beyond that point." Holmes, J., 214 U. S. 178, 29 Sup. Ct. 553, 53 L. Ed. 956.

Certain earlier decisions in the Circuit and District Courts proceeded upon a different view of the law and are now of doubtful authority. The principle appears to be that boundary waters, within the statute, must be in a real and substantial way a boundary between different jurisdictions; i. e., that the boundary must be based on the presence of such waters, and they must have, to some extent, at least, the character of a monument on a boundary line. This view is, I think, further supported by the last clause of the section, which refers to the states as "bounding on such waters." That a port of one state fronts on the same body of water as ports of another state does not make the water "boundary between them," within the statute. The line between Massachusetts and Rhode Island cuts across the head of Mt. Hope Bay; but the waters of the bay, while they lie between certain points in Massachusetts and in Rhode Island, have no relation to the boundary, and do not constitute either in law or in fact a boundary to either of the states. And I so find and rule. It follows that R. S. § 4236, is not applicable, and that the Massachusetts statute applies.

[1] "In 1740, when Rhode Island was regarded as a more loyal and obedient colony of the crown than Massachusetts, the king's commissioners came to hear and determine controversies between the two governments, and by a decision unexpected by both parties and sanctioned by no principle of law or equity set off to Rhode Island the towns of Bristol, Tiverton, Little Compton, and part of Barrington and Swanzey. But Rhode Island made no claim to any portion of territory on our southern border before these commissioners, who were sent for the special purpose of determining controversies of this character." Mass. Sen. Doc. 34, 1832, p. 6.

[3, 4] The final question is whether the vessel is relieved from liability to pay the libelant's fee because his offer was made outside of Massachusetts waters and at an unreasonable distance from his port. This point appears to be an afterthought; the steamer put her refusal at the time on no such ground. Her master, in view of the long distance through Rhode Island waters, evidently preferred to take a Rhode Island pilot. The pilot's offer need not be made within the territorial waters of his state or port. If, as I have held, Massachusetts pilots had the exclusive right to pilot to this port, it was not unreasonable on the part of . the libelant to tender his services where he did. The Georgia D. Loud, 8 Ben. 392, Fed. Cas. No. 5353; Horton v. Smith, 6 Ben. 264, Fed. Cas. No. 6709. The point was only a few hours from the port of destination, and the intervening waters are of such character that the vessel might need a local pilot for them. She was, of course, at liberty to take a Rhode Island pilot for the intervening waters; but doing so would not relieve her of the obligation to take a Massachusetts pilot for the Massachusetts port, or to pay pilotage fees, if she refused the pilot's offer.

Decree for libelant.

