**Kenneth H. WARNER et al.**

v.

**Charles F. REPLINGER, Chairman and member of the Rhode Island State Pilotage Commission,[1] et al.**

**Civ. A. No. 74–90.**

United States District Court, D. Rhode Island.

May 22, 1975.

---

[1]. Since the commencement of this action Chairman Replinger was succeeded in office as a member of the commission by George M. Smith who was subsequently succeeded in office by defendant James T. Beattie. Defendant Vernon D. Dunlap now serves as chairman. Richard J. Israel was succeeded as attorney general by defendant Julius C. Michaelson.

Ronald Dwight, Special Asst. Atty. Gen., Providence, R.I., William J. Riccitelli, Cranston, R.I., for defendants.

## MEMORANDUM OPINION

PETTINE, Chief Judge.

This opinion is supplemental to this Court's unpublished Memorandum and Order dated July 2, 1974,[2] wherein I denied the plaintiffs' request for the convening of a three-judge court, upheld their standing to prosecute this suit, found the defendants' contentions were insufficient to sustain a motion for summary judgment, and concluded that there only remained a factual determination by stating that the "very core" and "sole remaining issue" is " . . . whether the R. I. law is authorized by and falls within the scope of 46 U.S.C. Sec. 211" the "resolution" of which " . . . lies in determining whether Block Island Sound is a bay, inlet, river, harbor or port within the meaning of the 1789 federal statutes."[3]

46 U.S.C. Sec. 211 reads:

> "Until further legislative provision shall be made by Congress all pilots in the bays, inlets, rivers, harbors, and ports of the United States shall continue to be regulated in conformity with the existing laws of the States respectively wherein such pilots may be, or with such laws as the States may respectively hereafter enact for the purpose."

Defendants contend that since the commencement of this action the plaintiffs Warner and Losch have been licensed by the State of Rhode Island and therefore the case as to these plaintiffs has become moot, citing *DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). I need not reach this issue since it is undisputed the status of plaintiff Michael D. Ball remains unchanged. His standing to sue sus-

---

Martin Malinou, Providence, R.I., for plaintiffs.

2. In the interest of reporting this controversy in its entirety and to avoid needless repetition and reference to facts and law of the case as decided by this Court the Memorandum and Order of July 2, 1974 is appended hereto and made a part of this opinion, and denominated Appendix A.

3. Id. page 359.

tains the controversy and a decision by this Court will definitively resolve the issue as to the questioned Rhode Island statute.

### Findings of Fact

The affidavits, pleadings and the testimony in this hearing present a broad and somewhat amorphous background for a factual finding as to what constitutes a "bay", "inlet", "river", "harbor", or "port" within the meaning of the federal statute.

There is no solid legal precedent and so we must look to ancient documents, history, and as the plaintiffs urge, Article 7 of the Convention on the Territorial Sea and The Contiguous Zone.

By reference to Chart 1211 (19th ed) National Ocean Survey, National Oceanic and Atmospheric Administration, United States Department of Commerce, the plaintiffs drew various configurations by which the Rhode Island legislature could have intended to describe "Block Island Sound".[4] These were referred to as Area 1, comprising 203.1 square miles and Area 2, of 337.9 square miles. The boundaries of each were drawn out[5] and described as broad continuations of the open sea which cannot be termed a bay, inlet, river, harbor or port. With these configurations as a premise the defendants look to Article 7 of the Convention on the Territorial Sea and The Contiguous Zone, T.I.A.S. No. 5639, approved by the Senate, May 26, 1960, 106 Cong.Rec. 1196, and ratified March 24, 1961, 44 State Dept. Bull. 609. It defines a "bay" as " . . . a well marked indentation whose penetration is in such proportion to the width of the mouth as to contain landlocked waters and constitutes more than a mere curvature of the coast"; and further provides a test which requires that the area of a bay must be equal to or greater than the area within its closing lines as would be contained in a semi-circle whose diameter is equal to the distance between the

---

4. "Block Island Sound" is the only description used in the statute. The pertinent provisions of section 5 are:

> "46-9.1-5. VESSELS REQUIRED TO TAKE PILOT.—
>
> "Every foreign vessel and every American vessel under register entering or departing from any port or landing place of the state or transversing the waters of *Block Island Sound* shall take a pilot licensed under this chapter or under the laws of any other state having concurrent jurisdiction over these waters; and such vessels shall be subject to rules and regulations promulgated by the commission. In case of refusal to take such pilot, the master, owner, agent or consignee of any such vessel shall pay the established pilotage fee as if a pilot had been employed."

For other provisions see page 356, N 4 and 5, Memorandum and Order July 2, 1974.

5. AREA 1—The 203.1 sq. mi. (nautical miles) *body of water* shown on chart 1211 (19th Ed.) National Ocean Survey, National Oceanic and Atmospheric Administration, United States Department of Commerce, bounded by a line drawn from the easterly point of Point Judith, Rhode Island, to the southeasterly point of Block Island, Rhode Island, and a line drawn from the said southeasterly point of Block Island to the easterly point of Montauk Point, Long Island, New York, and a line drawn from said easterly point of Montauk Point to Watch Hill, Rhode Island, and by the land between Watch Hill and the easterly point of Point Judith.

AREA 2—The 337.9 square mile (nautical) body of water shown on chart 1211 (19th Ed.) National Ocean Survey, National Oceanic and Atmospheric Administration, United States Department of Commerce, bounded by a line drawn from the easterly point of Point Judith, Rhode Island, to the southeasterly point of Block Island, Rhode Island, and a line drawn from the said southeasterly point of Block Island to the easterly point of Montauk Point, Long Island, New York, and a line drawn from the westerly point of Montauk (Culloden Point) to the northeasterly point of Gardiner's Island, and a line drawn from the northwesterly point of Gardiner's Island to the southerly point of Plum Island, and a line drawn from the northeasterly point of Plum Island to the southeasterly point of Great Gull Island, and a line drawn from the northeasterly point of Great Gull Island to the Race Point on Fisher's Island, and a line drawn from East Point on Fisher's Island to Watch Hill, Rhode Island, and by the land between Watch Hill and the easterly point of Point Judith. Described as such in plaintiffs' brief pp. 49–53.

entrance points to the bay; "Where, because of the presence of islands, an indentation has more than one mouth, the semi-circle shall be drawn on a line as long as the sum total of the lengths of the lines across the different mouths."[6]

The configurations drawn by the plaintiffs' expert as set forth in N. 5 *supra*, readily show that this test is not satisfied and, if applied and considered alone, Block Island Sound would not constitute a bay within the meaning of the convention. In support of their position the plaintiffs cite *United States v. California*, 381 U.S. 139, 85 S.Ct. 1401, 14 L.Ed.2d 296 (1965) as adopting this international rule for defining a bay. By way of dicta, I find the plaintiffs' position unpersuasive when applied within the factual framework before me because the Convention pertained to national sovereignty and proprietary interests which are not the issues here as existed in *United States v. California, supra,* where suit was brought by the United States against the state of California as it related to the dominion over submerged lands and mineral rights under the three mile belt of sea off the California coast. The court specifically stated at page 142, 85 S.Ct. 1401, the suit was to determine "mineral rights" under the three mile belt of sea off the coast of California, and it adopted the convention definition only for the purposes of the Submerged Lands Act, *id.* 165, 85 S.Ct. 1401. The case did not deal with such navigational issues as are present in this controversy. To me the two situations cannot be equated because they present diametric positions. Navigation with all its attendant dangers is a far cry from asserted ownership of land which happens to be under water. However, conceding *arguendo* respectable extrapolation to the contrary may be made so as to include navigational situations, the plaintiffs nevertheless do not succeed. On a sheer factual basis the semi-circle test does not apply, for the evidence fails to establish that the configurations drawn by the plaintiffs are controlling.

The plaintiffs' own expert could give no reason why the pattern should not be applied to the entire geographical body of water enclosed within lines drawn at the East River in New York City on the west and between Point Judith, Block Island and Montauk on the east.[7] If this were done it is conclusive, as admitted, that the area enclosed, including Block Island Sound and Long Island Sound, would constitute a bay within the meaning of the Convention. To me this configuration, which takes into consider-

**6.** The full text of Article 7 is as follows:

"1. This article relates only to bays the coasts of which belong to a single state.

2. For the purpose of these articles a bay is a well-marked indentation whose penetration is in such proportion to the width of its mouth as to contain landlocked waters and constitute more than a mere curvature of the coast. An indentation shall not, however, be regarded as a bay unless its area is as large as, or larger than, that of the semi-circle whose diameter is a line drawn across the mouth of that indentation.

3. For the purpose of measurement, the area of an indentation is that lying between the low-water mark around the shore of the indentation and a line joining the low-water marks of its natural entrance points. Where, because of the presence of islands, an indentation has more than one mouth, the semi-circle shall be drawn on a line as long as the sum total of the lengths of the lines across the different mouths. Islands within an indentation shall be included as if they were part of the water areas of the indentation.

4. If the distance between the low-water marks of the natural entrance points of a bay does not exceed twenty-four miles, a closing line may be drawn between these two low-water marks, and the waters enclosed thereby shall be considered as internal waters.

5. Where the distance between the low-water marks of the natural entrance points of a bay exceeds twenty-four miles, a straight baseline of twenty-four miles shall be drawn within the bay in such a manner as to enclose the maximum area of water that is possible with a line of that length.

6. The foregoing provisions shall not apply to so-called 'historic' bays, or in any case where the straight baseline system provided for in article 4 is applied."

**7.** See defendants' exhibit A and other map exhibits introduced in evidence.

ation all the different mouths, makes infinitely more sense within the rationale of international relations and comports with the clear language of the Convention that "where, because of the presence of islands, an indentation has more than one mouth, the semi-circle shall be drawn on a line as long as the sum total of the lengths of the lines across the different mouths." N. 6, *supra*.

■ Furthermore, the terms of the Convention do not apply to so-called "historic" bays. "Essentially these are bays over which a coastal nation has traditionally asserted and maintained dominion with the acquiescence of foreign nations." *United States v. California, supra* at p. 172, 85 S.Ct. at p. 1419. At trial it was conceded that foreign fishing vessels are not permitted to fish in Block Island Sound and though specific acts of dominion were not introduced, historically the term "bay" was loosely used in the 18th century encompassing configurations that were triangular, long and narrow, and broad areas with a wide expanse of sea.[8] As examples one need only look to the expansive indentations of Massachusetts Bay, or the Bays of Bonavista, Trepassey or Placentia in Newfoundland. This was all placed on the record.

The plaintiffs further argue that a bay is a place used by boats as a harbor of refuge, a port or anchorage and that their witnesses testified such is not so as to Block Island Sound. On the other hand the defendants' witnesses who stated the contrary were more convincing and were bolstered by historic documentation as reflected in Defendants' Exhibit D, Des Barres, J. F. W., *The Coast of Nova Scotia, New England, New York, Jersey* (London 1778), Map No. 80, clearly showing that the area directly to the east of Block Island was used as an anchorage and harbor even in the 1770's. The Town of New Shoreham has had a port of necessity since its settlement. All this together with the presence of numerous shallow soundings throughout the Sound as shown on the maps introduced at trial and the evidence of the navigational hazards existing therein belie the assertion that the sound be considered part of the open ocean.[9]

Finally the plaintiffs urge that even if Block Island Sound contains a bay as a matter of constitutional law their Connecticut licenses to pilot foreign flag and American registry vessels are valid to transverse the waters of Block Island Sound en route to and from Connecticut ports since such routes are more than 3 miles off the Rhode Island shores at high water mark (except as to one of these routes for a distance of 1 mile) and that this is significant because,

"Sovereign jurisdiction of the three mile belt of territorial sea became vested in the United States, rather than the states, when, after 1776 the concept of territorial sea was recognized and its extent defined by the national government." (Plaintiffs' brief p. 55).

■ The terse reply is that no one questions the federal government's control over all navigable waters. However, it saw fit to enact 46 U.S.C. sec. 211 which specifically validates the regulation of pilots in the "bays" by the states respectively "wherein such pilots may be". It follows if you pass through a "bay" or an "inlet" or "river," a pilot of the state within which they lie may be required by such state. These pilotage laws exist at the sufferance of Congress, and it has not seen fit to preempt this field. Certainly under the authority of the Commerce clause it can act.

8. Thomas Jeffreys, *North American Atlas* (London 1778), Map 13, (Newfoundland), (Defendants' exhibit B); Gulf of Mexico called the "Bay of Mexico" in the seventeenth century, see John Seller, *Atlas Terrestris*, (London, Ca. 1676), Map 60, (Defendants' exhibit C).

9. Defendants' exhibits E and F, "Des Barres," *supra*; a chart of the Harbour of Rhode Island, William Heather, The Marine Atlas (London 1801) Chart 33.

However, as decisional law clearly establishes, such laws as we are discussing "fall within that class of powers which may be exercised by the states until Congress shall see fit to act." *Anderson v. Pacific Coast Steamship Company*, 225 U.S. 187, 32 S.Ct. 626, 56 L.Ed. 1047 (1912). As this court stated in its July 2, 1974 memorandum, the sole issue is whether Block Island Sound is a bay, inlet, river, harbor or port. Once that is established, there is no doubt it falls within the ambit of 46 U.S.C. sec. 211, and Rhode Island may constitutionally enact pilotage laws. The very wording of the section itself is unclouded and precise. The enabling legislation we are talking about concerns the sovereignty of the United States in all questions of navigation with regulatory power in the state, absent exercise of its paramount authority.[10]

46 U.S.C. sec. 212, which reads, "The master of any vessel coming into or going out of any port situated upon waters which are the boundary between two States, may employ any pilot duly licensed or authorized by the laws of either of the States bounded on such waters, to pilot the vessel to or from such port" is not relevant. No evidence was introduced, nor can this court conclude from a reading of the maps, that Block Island Sound is a boundary between Connecticut and Rhode Island or New York and Rhode Island.

The plaintiffs' reliance on *The Swift Arrow*, 292 F. 651 (D.Mass.1923), is misplaced, for as the defendants have stated, "In that case, the vessel made the mistake of using a R. I. pilot in Mass. waters. The vessel was not required to take a R. I. pilot because she was outside Narragansett Bay and not yet within waters where R. I. law then required a R. I. pilot, but the vessel was required by Mass. law to have a Mass. pilot in a Mass. port" (Defendants' brief p. 12). It does not stand for the constitutional contention recited by the plaintiffs.

The plaintiffs also cite *Leech v. Louisiana*, 214 U.S. 175, 29 S.Ct. 552, 53 L. Ed. 956 (1909), as authority "touching" on the position they take. Louisiana, relying on what is now 46 U.S.C. sec. 212, made it a criminal offense for a pilot not licensed under its laws to pilot a foreign vessel from the Gulf of Mexico to New Orleans though he held a Mississippi license.

The court, after finding that it was error to assume that the whole Mississippi was the boundary between Louisiana and Mississippi, held ". . . the section relied upon does not apply. That being out of the way, Louisiana had power to pass her local regulations." *Id.* 29 S.Ct. at 553. The plaintiffs can find little comfort in this case.

In a total sense, I find the defendants' evidence more persuasive. It is of greater weight.

Though it cannot always be that the application of the law and factual findings spawn pragmatic results, the court feels that this opinion achieves that end. In a very real sense there is much at stake for the State of Rhode Island in ensuring safe passage through its waterways. The sealed hazards of the sea in a bay such as Block Island Sound imperil not only the vessels that plow its waters, but more viciously the sacred lives of all those on board and the environmental integrity of the state's coastline. These dangers can only be avoided by those intimately familiar with such mysteries.

It is the sum total of the sanity and intelligence of the authorized congressional enactment which leaves to the states the determination of the qualification of those who shall be trusted with this responsibility, until Congress acts otherwise.

■ I find that Block Island Sound is a bay within the meaning of 46 U.S.C. sec. 211 and that R.I.Gen.L., 1956 (1969 Reenactment) sec. 46–9.1–1 *et seq.*,

10. See *Wilson v. McNamee* (12 Otto) U.S. 572, 26 L.Ed. 234 (1881); *Whistler*, 13 F. 295 (D.Or.1882). N.Y. Navigation Law s. 89–b (McKinney's), Opinion of the Attorney General of N.Y., Dec. 17, 1973.

properly requires that vessels transversing the waters of Block Island Sound be piloted by the individuals licensed by the State Pilotage Commission.

The defendants will draft an order accordingly.

APPENDIX A

July 2, 1974.

As Amended July 8, 1974.

*MEMORANDUM AND ORDER*

PETTINE, Chief Judge.

Seeking declaratory, 28 U.S.C. Secs. 2201, 2202 and injunctive relief, the plaintiffs in this civil action challenge R.I.Gen.Laws 1956 (1969 reenactment) sec. 46–9.1–1 *et seq.*, a statute which requires that all pilots of foreign flag and American registry vessels transversing Block Island Sound be licensed by the State of Rhode Island. The plaintiffs allege that the Rhode Island statute violates the Commerce Clause, Art. 1, Sec. 8, cl. 3, the Supremacy Clause, Art. 6, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. At present, this case comes before this Court on the plaintiffs' application for a three judge court pursuant to 28 U.S.C. Secs. 2281, 2284, and the defendants' motion[1] for summary judgment in accordance with Rule 56 of the Fed.R.Civ. P. against the plaintiffs.

Each of the named plaintiffs is a citizen and resident of the State of Connecticut. Each of the defendants is a citizen of the State of Rhode Island. There being more than $10,000 in controversy as to each plaintiff, jurisdiction is conferred upon this Court by 28 U.S.C. Sec. 1331 and 28 U.S.C. Sec. 1332.

*FACTUAL BACKGROUND*

R.I.Gen.Laws 1956 (1969 reenactment) sec. 46–9.1–5 requires every foreign vessel or American vessel under registry transversing the waters of Block Island Sound to take on a pilot licensed by the State of Rhode Island or by any other state having concurrent jurisdiction over these waters. To enforce this requirement, sec. 46–9.1–10 provides:

"Use of unlicensed pilots.—(a) It shall be unlawful for the master, owner, agent or consignee of any vessel, not exempt from the provisions of this chapter, entering or departing from any port or landing place of the state or transversing the waters of Block Island Sound to take on any person not licensed as a Block Island Sound pilot under this chapter or any person not licensed as such pilot under the laws of any state having concurrent jurisdiction over such waters to pilot such a vessel in said waters.

(b) Piloting Without License.—It shall be unlawful for any person not licensed as a Block Island Sound pilot or any person not licensed as such pilot by any state having concurrent jurisdiction over said waters to pilot or offer to pilot a vessel, not exempt from the provisions of this chapter entering or departing from any port or landing place of this state or transversing the waters of Block Island Sound. It shall likewise be unlawful for any master or person on board a tug or towboat to tow such a vessel unless such vessel shall have on board a duly licensed state pilot.

(c) Violations.—Violation of the provisions of subparagraphs (a) and (b) of this section shall be a misdemeanor punishable by a fine not to exceed five hundred dollars ($500), or by imprisonment not to exceed one (1) year, or both."

All of the plaintiffs are licensed by the State of Connecticut to pilot foreign flag and American registry vessels through Connecticut waters but none have been licensed by the State of Rhode

---

1. In their motion the defendants "mistakenly refer to themselves as the plaintiffs" and move for a summary judgment "against the defendant". Recognizing this clerical error, the Court will treat the motion as one by the defendants for judgment in their favor and against the plaintiffs.

Island. Each has earned his living by piloting vessels through the waters of Block Island Sound to Connecticut ports. In April 1973 defendant Replinger notified the Gulf Oil Trading Corporation, a corporation whose vessels plaintiff Warner had been piloting, that their employment of Warner violated sec. 46–9.1–10. Warner alleges that since the date of defendant Replinger's letter he has been unable to secure employment as a pilot with the Gulf Oil Trading Corporation and as a result has sustained a loss of pilotage fees in excess of $30,000. The complaint also asserts that Losch and Ball are presently the focus of an investigation by the defendants and each is being threatened with arrest and prosecution pursuant to sec. 46–9.1–10(c).

### THREE JUDGE COURT

When an injunction is sought against the enforcement of a state statute on grounds of unconstitutionality, a three judge court is required. 28 U.S.C. secs. 2281 and 2284. A three judge court is improper if the sole claim is that a state statute conflicts with a federal statute which is controlling by virtue of the Supremacy Clause. *Swift and Co. v. Wickham*, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). Nor need a three judge court be convened when prior decisions make the claim that a statute is unconstitutional wholly insubstantial, legally speaking non-existent. *Swift and Co. v. Wickham, supra; Bailey v. Patterson*, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); Ex parte *Poresky*, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933). The Supreme Court in *Bailey v. Patterson, supra,* stated:

"The three-judge requirement is a technical one to be narrowly construed, *Phillips v. United States*, 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L. Ed. 800. The statute comes into play

only when an injunction is sought 'upon the ground of the unconstitutionality' of a statute. There is no such ground when the constitutional issue presented is essentially fictitious." 369 U.S. at 33, 82 S.Ct. at 551.

Consideration of these principles necessarily involves an examination of the nature and merits of this controversy.

The plaintiff asserts three basic grounds to support this action. The first seeks a declaration that sec. 46–9.1 –1 *et seq.* violates Art. 1, Sec. 8, cl. 3, the Commerce Clause of the U. S. Constitution.[2] The courts have long agreed that state pilotage laws are regulations of commerce. *Kotch v. Board of River Port Pilot Com'rs*, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093, re-hearing denied 331 U.S. 864, 67 S.Ct. 1196, 91 L.Ed. 1869 (1947); *Anderson v. Pacific Coast Steamship Co.*, 225 U.S. 187, 32 S.Ct. 626, 56 L.Ed. 1047 (1912); *Wilson v. McNamee*, 102 U.S. 572, 26 L.Ed. 234 (1881); Ex parte *McNiel*, 80 U.S. (13 Wall) 236, 20 L.Ed. 624 (1872); *Cooley v. Board of Wardens of Port of Philadelphia*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851). However, each of these courts also unanimously hold that in light of the passage of 1 Stat. at Large 54, 46 U.S.C. Sec. 211[3] by Congress in 1789, state pilotage laws governing the waters described in 46 U.S.C. Sec. 211 do not violate the Commerce Clause. In *Anderson v. Pacific Coast Steamship Co., supra,* Mr. Justice Hughes succinctly stated the basis for this holding:

"When the Constitution of the United States was adopted, each state had its own regulations of pilotage. While this subject was embraced within the grant of the power 'to regulate commerce with foreign nations and among the several states' (art. 1, § 8), Congress did not supersede the state leg-

2. The Commerce Clause provides, "the Congress shall have power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

3. 46 U.S.C. sec. 211 states, "until further provision is made by Congress, all pilots in

the bays, inlets, rivers, harbors, and ports of the United States shall continue to be regulated in conformity with the existing laws of the States respectively wherein such pilots may be, or with such laws as the States may respectively enact for the purpose".

islation, but by the act of August 7, 1789, chap. 9, § 4 (1 Stat. at L. 53, 54, Rev.Stat. § 4235, U.S.Comp.Stat.1901, p. 2903), it was enacted that 'all pilots in the bays, inlets, rivers, harbors, and ports of the United States, shall continue to to be regulated in conformity with the existing laws of the states respectively wherein such pilots may be, or with such laws as the states may respectively hereafter enact for the purpose, until further legislative provision shall be made by Congress.' This was 'a clear and authoritative declaration by the first Congress, that the nature of this subject is such that until Congress should find is necessary to exercise its power it should be left to the legislation of the states;' and it has long been established by the decisions of this court that, although state laws concerning pilotage are regulations of commerce, they fall within that class of powers which may be exercised by the states until Congress shall see fit to act." 225 U.S. at 195, 32 S.Ct. at 629.

Consequently, so long as a state statute governing the licensing of pilots falls within the ambit of 46 U.S.C. sec. 211, the state statute is permissible under the Commerce Clause. Thus, the sole issue left to be resolved by this ground is the same posited by the second ground, does the R. I. statutory scheme established by sec. 46–9.1–1 *et seq.* conflict with 46 U.S.C. sec. 211 thereby creating a violation of the Supremacy Clause? That being the case, 28 U.S.C. § 2281 does not require the convening of a three judge court to resolve the issues posed by the plaintiffs' first two grounds. Separate from the possible conflict with the relevant federal statutes, no substantial commerce clause claim is raised by the plaintiffs.[4]

Finally, the plaintiffs allege that the R. I. legislation without due process of law deprives them of a property right granted to them by the license they have obtained from the State of Connecticut. This assertion is without foundation. Connecticut is without

4. The plaintiffs also claim that the R.I. Statutory Regulations serve no reasonable R.I. purpose. This is ironic because in their opposition to the defendants' motion for summary judgment, the plaintiffs argue that the R.I. General Assembly by enacting this legislation found a need for the use of a local pilots knowledge and experience in transversing these waters. Without question this concerned represents a legitimate state interest. *Kotch v. Board of River Port Pilot Com'rs, supra.* In *Kotch* the court wrote: "Studies of the long history of pilotage reveal that it is a unique institution and must be judged as such. In order to avoid invisible hazards, vessels approaching and leaving ports must be conducted from and to open waters by persons intimately familiar with the local waters. The pilot's job generally requires that he go outside the harbor's entrance in a small boat to meet incoming ships, board them and direct their course from open waters to the port. The same service is performed for vessels leaving the port. Pilots are thus indispensable cogs in the transportation system of every maritime economy. Their work prevents traffic congestion and accidents which would impair navigation in and to the ports. It affects the safety of lives and cargo, the cost and time expended in port calls, and

in some measure, the competitive attractiveness of particular ports. Thus, for the same reasons that governments of most maritime communities have subsidized, regulated, or have themselves operated docks and other harbor facilities and sought to improve the approaches to their ports, they have closely regulated and often operated their ports' pilotage system." 330 U.S. at 557–558, 67 S.Ct. at 913. Additionally, the R.I. legislature adopted the following declaration of policy in conjunction with the passage of this legislation: "Declaration of policy—It is declared to be the policy and intent of the General Assembly and the purpose of this chapter: (1) to provide maximum safety for the dangers of navigation for vessels entering or leaving the waters of this state; (2) to maintain a state pilotage system devoted to the preservation and protection of lives, property and vessels entering or leaving waters of this state at the highest standard of efficiency, and (3) to ensure an adequate supply of pilots well qualified for the discharge of their duties." Therefore, even this assertion by the plaintiffs has little merit except as it refers to a conflict with 42 U.S.C. sec. 211 and alleges that R.I. possesses no power to regulate the particular waterway in question.

power to issue a license covering pilotage through waters under the exclusive jurisdiction of R. I. and as to those waters over which the two states have concurrent jurisdiction, R. I. recognizes the validity of Connecticut's license.[5] Accordingly, the plaintiffs having asserted no substantial constitutional claims, their motion for a three judge court be and the same is hereby denied.[6]

### SUMMARY JUDGMENT

The defendants move for summary judgment pursuant to Rule 56, Fed.R. Civ.P. contending the plaintiffs lack standing in that the R. I. statutory scheme is authorized by 46 U.S.C. sec. 211.

▮▮▮ The standing argument is hereby rejected. The plaintiff Warner's allegation that defendants' action has resulted in a $30,000 economic loss of pilotage fees and poses a continuing bar to the means from which he earns his livelihood firmly establishes a personal stake in the outcome as pronounced by decisional law articulating Art. 3, U. S. Constitution, requirements:

> "Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a 'personal stake in the outcome of the controversy,' *Baker v. Carr,* 369 U.S. 186, 204,

[82 S.Ct. 691, 703, 7 L.Ed.2d 663], as to ensure that 'the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.' *Flast v. Cohen,* 392 U.S. 83, 101 [88 S.Ct. 1942, 1953, 20 L.Ed.2d 947]." *Sierra Club v. Norton,* 405 U. S. 727, 732, 92 S.Ct. 1361, 1364, 31 L. Ed.2d 636. See also *United States v. SCRAP,* 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1973).

This brings us to the very core and sole remaining issue of the controversy, *i.e.,* whether the R. I. law is authorized by and falls within the scope of 46 U.S. C. Sec. 211. Resolution lies in determining whether Block Island Sound is a bay, inlet, river, harbor or port within the meaning of the 1789 federal statutes.

▮▮▮ The defendants contend that the R. I. statutory scheme is authorized by 46 U.S.C. Sec. 211 and offer as the only document in support of their position a national ocean survey map covering Block Island Sound published by the U. S. Dept. of Commerce National Oceanic and Atmosphere Administration.[7] However, no supporting affidavits were filed, and I must conclude it is insufficient to sustain a summary judgment motion and rule the same is

---

5. 46–9.1–5 Vessels required to take pilot.— Every foreign vessel and every American vessel under register entering or departing from any port or landing place of the state or transversing the waters of Block Island Sound shall take a pilot licensed under this chapter or under the laws of any other state having concurrent jurisdiction over these waters; and such vessel shall be subject to rules and regulations promulgated by the commission.

6. I have not discussed Count II of the plaintiffs' complaint because the parties have informed the Court in conference that Count II *is presently moot.* In any case Count II would not warrant a three judge court because the thrust of the plaintiffs' claim here is that state officials are administering a constitutional statute in an unconstitutional

manner. *Phillips v. United States,* 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800; *Ex parte Bransford,* 310 U.S. 354, 60 S.Ct. 947, 84 L. Ed. 1249 (1940).

7. To be admissible for consideration in deciding a Rule 56 motion a document must be authenticated by and attached to an affidavit that meets the requirement of Rule 56(e). *Steven v. Roscoe Turner Aeronautical Corp.,* 324 F.2d 157 (7th Cir. 1963); *Douglas v. Beneficial Finance Co. of Anchorage,* 334 F.Supp. 1166, 1169 (D.Alaska). The map submitted by the defendants has not been so certified. However, the plaintiffs have not objected to its admission for consideration and the Court may deem their objection waived. *Auto-drive-away Co. of Hialeah, Inc. v. ICC,* 360 F.2d 446, 448–449 (5th Cir. 1966).

**360**

hereby denied unless within 10 days from the issuance of this opinion defendant files affidavit satisfying its burden of proof that no genuine issue of fact exists that the designated waters as shown by the map were intended to and do fall within the scope of 46 U.S.C. sec. 211. Something more than this map is necessary to establish that the waters in question constitute a bay, inlet, river, harbor or port.

So ordered.